**J SQUARED, INC. d/b/a University Loft Co. and as University Loft Company, Appellant,**

v.

**Daniel HERNDON, Appellee.**

No. 49A04–0407–CV–394.

Court of Appeals of Indiana.

Feb. 18, 2005.

Thomas R. Devoe, Sommer Barnard, Indianapolis, IN, Attorney for Appellant.

Robert S. Rifkin, Maurer Rifkin & Hill, Carmel, IN, Attorney for Appellee.

## OPINION

NAJAM, Judge.

### STATEMENT OF THE CASE

J Squared, Inc. d/b/a University Loft Company ("ULC") appeals from the trial court's judgment in favor of Daniel Herndon on his complaint seeking payment of commissions following the termination of his employment with ULC. The trial court awarded Herndon compensatory and liquidated damages and attorney's fees. ULC presents the following issues for our review:

1. Whether the trial court erred when it concluded that Herndon was entitled to the disputed commissions.

2. Whether the trial court erred when it concluded that Herndon was entitled to liquidated damages and attorney's fees under the Indiana Wage Claims Statute.

We affirm.

### FACTS AND PROCEDURAL HISTORY

ULC is an Indiana corporation in the business of importing, manufacturing, and selling furniture, mostly to universities for

use in dormitory rooms. Herndon began working as a salesman for ULC in 2000. Herndon's compensation was to be paid as follows:

> Sales persons receive 2% commission on every order that has shipped, installed, and is paid in full. Exceptions to this policy include misquoted orders (pricing or product).
>
> Payment of Guarantee (Draw)—A guarantee/draw is defined as an amount advanced by University Loft Company (ULC) to the sales person on a bi-weekly or otherwise agreed interval to assure consistent income for the person until such time as the sales person's earned commissions equal or exceed the draw. In the event the employee leaves the employment of ULC, the obligation to repay the amounts received by said sales person from ULC survives. ULC may withhold any wages or salaries due the employee at the termination of employment for repayment of the guarantee amounts previously paid. ULC may in its sole discretion wa[i]ve the repayment of draws. Sales staff will be advised every month of actual earned commissions versus draw. Management reserves the right to adjust (increase or decrease) a sales person's draw on a quarterly basis. Additional commissions owed by ULC will be paid in full at the end of the year.

Plaintiff's Exhibit 7. In sum, Herndon was paid a draw biweekly, and he was paid a commission on his sales after the customer paid ULC. In the usual course of business, months would elapse between the time a sale was made and the time the customer received and paid for the order.

In June 2002, Herndon expressed his dissatisfaction with his job to ULC's vice-president, Jeff Carlson, and he told Carl-

son that he was thinking about leaving ULC in August or September 2002. Carlson told ULC's owner, James Jannetides, about Herndon's intentions, and Jannetides told Carlson to tell Herndon that if he was planning to leave in a few months' time, then he should just leave immediately. When Herndon again expressed that he would not make a long-term commitment to ULC, Jannetides fired him.[1] At that time, Herndon had more than $1 million in approved sales that had not yet been shipped or paid for, so he had not yet received his commissions on those sales.

On July 19, 2002, approximately three weeks after Herndon left ULC, Susan Winter, ULC's human resources director, sent Herndon a letter and enclosed two checks. The letter read in relevant part as follows:

> As discussed on the telephone today, I have included with this letter your final 2 checks from University Loft Company (ULC). Check # 3630 is for your final commissions/incentives owed (this check includes all commissions due to you), and Check # 3629 is severance pay. By signing these checks, you are releasing University Loft Company from all future wage claims.

Plaintiff's Exhibit 9. Herndon sent Winter the following letter in response:

> On July 19, 2002, you sent me two checks. Check # 3630 in the amount of $206.13 was a commission check. Check # 3629 in the amount of $1,874.98 was a proposal for severance pay.
>
> I am returning both of these checks to you because I do not want to release University Loft Company from possible future wage claims.

---

1. There is conflicting evidence regarding whether Herndon quit or was fired. The trial court found that he was fired. We will not reweigh the evidence on appeal.

In your letter of July 19, 2002, you said that if I cashed the checks, I would be releasing the company from all future wage claims. *I believe I am entitled to commissions on all sales I made while employed by the company, and I believe my total commissions will substantially exceed the amount I have received as a draw.*

*I expect the company to pay me my commissions as orders are shipped and customers pay for the merchandise.*

I would still like to be paid for the commissions represented by check # 3630, but no strings should be attached. If you are willing to pay me the $206.13 with no strings attached, you can send me another check to replace check # 3630.

*I will expect you to pay me the rest of my commissions as time goes on.*

Plaintiff's Exhibit 10 (emphases added).

Herndon did not receive any response to his letter, and he sent a second letter to Winter on November 4, 2002, which read as follows:

Back on July 29, 2002, I wrote a letter to you asking University Loft to pay me my commissions as my sales orders were shipped and customers paid for merchandise. I have received no additional commissions, and yet it is my understanding that most, if not all, of my sales orders have been shipped and paid for.

*According to my calculations, I have earned at least $41,240.00 in commissions this year and I have only been paid $31,384.70 to date. If my calculations are correct, the company still owes me $9,855.30.*

I will expect the company to write me a check for $9,855.30 plus interest or, at a minimum, provide me with an accounting of my sales and commissions earned and a check for any commissions not disputed by the company. (If the company's accounting differs from my calculation of commissions due and owing, then I may need additional information from the company in an attempt to resolve the discrepancy.)

If any of my orders are still outstanding (the product has not shipped, or the customer has not paid for the product) then the company should simply pay me for commissions earned to date and we can settle up on the remaining commissions as orders are later shipped and paid for.

I would like to be paid promptly, as I have not received any commission payments from the company since July. It should not take the company more than a day or two to prepare an accounting of my sales and commissions; accordingly, I will expect full payment of my commissions due and owing no later than Thursday, November 14, 2002.

Plaintiff's Exhibit 23 (emphasis added).

When Herndon still had not received any response from ULC five months after his November 2002 letter, he contacted an attorney. On April 17, 2003, Herndon filed a complaint against ULC alleging its failure to pay him commissions due and owing. In addition to compensatory damages, Herndon sought liquidated damages and attorney's fees under the Indiana Wage Claims Statute. Following a bench trial, the trial court entered judgment in favor of Herndon. The court found and concluded as follows:

### Introduction

Plaintiff, Daniel Herndon, ("Herndon") seeks sales commissions after employment termination, as well as double damages and attorney's fees under Indiana's Wage Claim Statute. Defendants J Squared, Inc., d/b/a University Loft Co. ("ULC") argues the parties'

conduct precludes post-termination commissions, and [that] the Wage Claim Statute does not apply. The Court finds Herndon is entitled to commissions in the amount of $14,629.53. The Court further finds the Wage Claim Statute applies, and also enters judgment for the additional liquidated damages amount of $29,259.06 plus attorney's fees.

## Facts

ULC makes furniture for colleges and does direct sales.

Herndon became employed at ULC in 1998 as an hourly intern. By February 26, 2000 he was a salesman working on draws and 2% commissions. In early 2002, Herndon became unhappy with his employment at ULC. The parties attempted to negotiate a voluntary end to Herndon's employment. When they could not agree, ULC involuntarily terminated Herndon on June 24, 2002.

ULC communicated a policy that sales commissions are "earned" when the merchandise is shipped, installed, and paid. Herndon understood this policy and accepted it. The parties stipulate [that during his tenure as a salesman] Herndon made sales that were shipped, installed, and paid which totaled $6,459,000.00, 2% of which is $129,180.00.

There is evidence that ULC intended to adopt a policy that sales commissions could only be paid during the time a person was employed, and not after termination. But it was not adopted nor fully communicated. Furthermore, the evidence shows it was not accepted or agreed [to] by Herndon, other salespersons, or other key sales managers. All of Herndon's pending sales eventually paid after he was terminated, but ULC refuses to pay them. He was only paid draws and commissions totaling $114,550.47.

## Law

Under I.C. 22–2–9–2 ("Wage Claim Statute"):

> Whenever an employer separates any employee from the payroll, the unpaid wages or compensation of such employee shall become due and payable at regular payday for a pay period in which separation occurred....

Sales commissions are "wages" for purposes of the Wage Claim Statute. *Licocci v. Cardinal Associates* [492 N.E.2d 48 (Ind.Ct.App.1986) ]. When an employer fails to make payment of such wages, liquidated damages are double the amount of wages due plus reasonable attorney's fees. I.C. 22–2–5–2.

As a general rule, a person employed on a sales commissions basis is entitled to commissions when the order is accepted even if the employee is terminated before payment is made. *Vector v. Peuquet* [431 N.E.2d 503 (Ind.Ct.App. 1982) ]; *Robinson v. Century Personnel* [678 N.E.2d 1268 (Ind.Ct.App.1997) ]; *Sample v. Kinser Insurance* [700 N.E.2d 802 (Ind.Ct.App.1998) ]. Under *Vector*, "This general rule may be altered by a written agreement of the parties or by the conduct of the parties which clearly demonstrates a different compensation scheme." 431 N.E.2d at 505.

## Analysis

Under Indiana law, the Wage Claim Statute includes sales commissions. Under *Vector*, those commissions are earned at the time the sale is made, even if they are paid after termination. Therefore, the wage claim statute clearly applies to Herndon's commissions unless *Vector's* general rule is "altered by a written agreement by the parties or by the conduct of the parties which clearly demonstrates a different compensation scheme."

The evidence shows no written agreement by the parties to pay commissions only during the time of employment. The record does include evidence that ULC intended to adopt a different scheme by a written policy. However, there is no evidence showing a written *agreement* between Herndon and ULC, or any conduct of the parties here showing such policy became the compensation scheme for Herndon.

Much of ULC's evidence and argument relates to whether Herndon's imputed or actual knowledge is sufficient to alter *Vector's* general rule. The record is inconclusive regarding Herndon's knowledge. Regardless, knowledge does not prove "conduct" or "agreement" as required by *Vector*.

Accordingly, Herndon is entitled to unpaid commissions in the amount of $14,629.53, plus the double liquidated damage amount under the Wage Claim Statute of $29,259.06, and attorney's fees.

**Judgment**

Judgment entered for Plaintiff in the amount of $43,888.59 plus attorney's fees.[2]

Brief of Appellant at 13–16 (emphases original). This appeal ensued.

## DISCUSSION AND DECISION

### Standard of Review

■ In this case, ULC avers that it "is challenging the trial court's application of the law to the findings of fact made by the trial court." Brief of Appellant at 6. In other words, ULC does not challenge the trial court's findings of fact. As such, our review is de novo. *See Lumbard v. Farmers State Bank*, 812 N.E.2d 196, 200 (Ind. Ct.App.2004) (noting review of whether tri-

al court properly applied law to undisputed facts is de novo).

### Issue One: Commissions

■ ULC first contends that it does not owe Herndon any compensation for sales he had made but which had not yet been shipped and paid for prior to his termination. In particular, ULC maintains that the trial court misapplied this court's holding in *Vector Eng'g and Mfg. Corp. v. Peuquet*, 431 N.E.2d 503 (Ind.Ct.App. 1982). We cannot agree.

In *Vector*, an employee, Peuquet, sued Vector for unpaid commissions after he was terminated. In that case, Peuquet's commissions "were computed on the basis of what had been shipped rather than the orders that had been turned in." *Id.* at 504. Vector maintained that Peuquet was not entitled to commissions where the orders had shipped after Peuquet's termination. The trial court disagreed and entered judgment in favor of Peuquet in the amount of the commissions pending shipment at the time of his termination.

On appeal, we affirmed the trial court and held as follows:

As a general rule, a person employed on a commission basis to solicit sales orders is entitled to his commission *when the order is accepted* by his employer. *The entitlement to commissions is not affected by the fact that payment for those orders may be delayed until after they have been shipped.* This general rule may be altered by a written agreement by the parties or by the conduct of the parties which clearly demonstrates a different compensation scheme. If Vector had desired to deny commissions to Peuquet subsequent to his termination as an employee, Vector could have provided

2. The trial court awarded Herndon $47,382 in attorney's fees and $1,759.84 in costs.

for this contingency in clear and unambiguous language.

*Id.* at 505 (citations omitted, emphases added).

In this case, the trial court concluded that the general rule set out in *Vector* applied and that Herndon was entitled to the unpaid commissions. Indeed, while there was some dispute at trial regarding whether ULC had an agreement with Herndon that he would not receive commissions on sales approved but unpaid at the time of termination, there is sufficient evidence to support the trial court's finding that there was no such agreement or conduct suggesting such an agreement. Regardless, ULC does not dispute the trial court's factual findings on appeal.

Rather, ULC contends as follows:

The trial court's Judgment for Plaintiff appears to be based on the faulty premise that ULC could avoid the general rule in *Vector* only by adopting a policy that specifically *forfeited* Herndon's right to payment of post-termination commissions. (Appellant's App., pp. 71–74). However, the necessity of a "forfeiture" policy arises only if the employee has already "earned" the commissions before termination. Since Herndon did not earn the post-termination commissions during his employment, there was nothing for him to forfeit upon termination.

Brief of Appellant at 8 (emphases original). ULC's argument on this issue hangs on the meaning of the word "earn," which the trial court used in its findings,[3] but which does not appear anywhere in our decision in *Vector.* ULC attempts to make some distinction between when a commission is "earned," which it defines as when an order is shipped, installed, and paid for, and when a sale is approved. But our analysis in *Vector* does not suggest any such distinction is warranted.

Here, as in *Vector,* prior to his termination, Herndon had made several approved sales which were pending shipment and payment by the customer. Herndon's commissions on those orders were "vested subject to a condition subsequent." *See Vector,* 431 N.E.2d at 505; *see also Sample v. Kinser Ins. Agency, Inc.,* 700 N.E.2d 802, 804 (Ind.Ct.App.1998) (holding employee entitled to commissions where "[t]he sales had been consummated, and her right to the commissions had fully accrued, subject only to actual receipt of the [ ] payments."). The circumstances in this case are on all fours with those in *Vector,* and the trial court correctly applied that holding here. The evidence supports the trial court's finding that there was no written agreement or conduct of the parties showing that ULC had a policy of not paying vested but pending commissions at the time of an employee's termination. The trial court did not err when it awarded Herndon compensation for his unpaid commissions.

### Issue Two: Wage Claims Statute

■ ULC next contends that the trial court erred when it awarded liquidated damages and attorney's fees under the Indiana Wage Claims Statute. In particular, ULC maintains that the statute only applies to wages "earned during employment and due and payable within the next regular payday following termination." Brief of Appellant at 9. ULC asserts that "[b]ecause the commissions claimed by Herndon were not earned during his em-

---

**3.** The trial court found that "ULC communicated a policy that sales commissions are 'earned' when the merchandise is shipped, installed, and paid. Herndon understood this policy and accepted it." Brief of Appellant at 14. We reject ULC's assertion that this finding warrants any distinction between this case and *Vector.*

ployment and were not due and payable (or even calculable) within the next regular payday following his termination, the statute simply does not apply." *Id.* Again, we cannot agree.

■ Indiana Code Section 22–2–9–2, the Wage Claims Statute, provides in relevant part as follows: "Whenever any employer separates any employee from the pay-roll, the unpaid wages or compensation of such employee shall become due and payable at [the] regular pay day for [the] pay period in which separation occurred[.]"[4] Further, if an employer does not comply with that statute, it is subject to the provisions of Indiana Code Section 22–2–5–2:

> Every such person, firm, corporation, or association who shall fail to make payment of wages to any such employee ... shall, as liquidated damages for such failure, pay to such employee for each day that the amount due to him remains unpaid ten percent (10%) of the amount due to him in addition thereto, not exceeding double the amount of wages due, and said damages may be recovered in any court having jurisdiction of a suit to recover the amount due to such employee, and in any suit so brought to recover said wages or the liquidated damages for nonpayment thereof, or both, the court shall tax and assess as costs in said case a reasonable fee for the plaintiff's attorney or attorneys.

Indiana Code Section 22–2–9–1 includes commissions in the definition of wages. And this court has held that commissions are wages within the meaning of Indiana Code Section 22–2–5–2. *See Licocci v.*

*Cardinal Associates, Inc.,* 492 N.E.2d 48, 56 (Ind.Ct.App.1986), *trans. denied.*

Initially, we note that there is no statutory definition of "regular pay day" as that term is used in the Wage Claims Statute, and neither party attempts to define that term in their arguments on appeal. The evidence shows that Herndon received his draw biweekly, but he did not receive his commissions on any set schedule. The dictionary defines "payday" as "the day on which employees' salaries or wages are paid." THE AMERICAN HERITAGE DICTIONARY 1330 (3d ed.1996). Here, there are two distinct "regular" paydays that apply. Herndon received his draw biweekly, but he received his commissions after his approved orders were shipped and paid for. Thus, the "regular payday" for Herndon's commissions varied.

There is no dispute that at the time Herndon left his employment with ULC, he had secured sales on orders that had not yet been shipped and/or paid for. ULC asserts that because it did not owe Herndon any commissions at the "regular payday" following his termination, then it is not subject to the penalty under Indiana Code Section 22–2–5–2. But, again, neither party explains what the regular payday for commissions was in this case. Presumably, ULC means that no commissions were owed on the date of the next biweekly draw date following his termination. But, as we have already noted, those biweekly paydays were different from the paydays for commissions in excess of the draws.

ULC contends that the Wage Claims Statute only applies where an employer

---

4. There is some confusion among the parties whether the Wage Claims Statute or the Wage Payment Statute applies. The former applies where, as here, an employee is fired, and the latter applies where an employee quits. Although there was conflicting evidence regarding whether Herndon left ULC voluntarily or involuntarily, the trial court found, and ULC does not dispute on appeal, that ULC fired Herndon. As such, we apply Indiana Code Section 22–2–9–2 here.

refuses to pay wages "due and owing at the time of discharge," citing *New Frontiers, Inc. v. Goss,* 580 N.E.2d 310, 312 (Ind.Ct.App.1991), *trans. denied,* and *United States Reduction Co. v. Nussbaum,* 112 Ind.App. 330, 42 N.E.2d 403, 405 (1942). ULC maintains that because none of Herndon's pending orders had been paid for at the time of his discharge, there was nothing "due and owing" at that time. But neither of those cited cases is dispositive of the issue before us. In both cases, the plaintiffs were seeking wages for work they had not done; they claimed that they were owed wages under the terms of their respective contracts. *See, e.g., New Frontiers, Inc.,* 580 N.E.2d at 311–12 (defendant failed to comply with thirty-day notice requirement in employment contract); *Nussbaum,* 42 N.E.2d at 403 (under terms of month-to-month employment contract, plaintiff sought payment for full month after working only two days of month).

In contrast, here, Herndon had completed all of the work necessary for him to earn his commissions, but his payment was merely deferred until the orders were shipped and the customers paid ULC. As such, Herndon's right to receive the commissions had vested at the time of his termination. *See, e.g., Die & Mold, Inc. v. Western,* 448 N.E.2d 44, 46–47 (Ind.Ct. App.1983) (holding employee's right to receive vacation pay is vested when services are rendered; employee denied accrued vacation pay at termination entitled to liquidated damages and attorney's fees under statute).

The issue, then, is whether ULC is exempt from the statutory penalty by the mere fact that Herndon was not owed his commissions at the time of the next biweekly pay period following his termination. We conclude that such an interpretation of the statute would produce an unfair and absurd result. *See Livingston*

*v. Fast Cash USA, Inc.,* 753 N.E.2d 572, 576 (Ind.2001) (declining to adopt appellee's interpretation of statute where it was "inconsistent with the purposes and policies of the [statutory scheme] and create[d] an absurd result which the legislature could not have intended[.]"). The simple fact is that ULC owed Herndon his commissions when and as they became due following his termination, but refused to pay him. We have observed that "'[t]he purpose of the statute is to impose a penalty upon an employer for his failure to pay an employee wages earned, *when due,* after a proper demand has been made therefor.'" *Nussbaum,* 42 N.E.2d at 405 (emphasis added) (quoting *Robinson v. St. Maries Lumber Co.,* 34 Idaho 707, 204 P. 671, 672 (1922)).

In this case, ULC had accepted the orders but refused to pay Herndon his commissions as they became due following his termination. The evidence shows that all of the pending orders had been shipped and paid for by the end of 2002. But, despite Herndon's requests for an accounting and payment, ULC still had not paid Herndon his commissions on those sales when he filed his complaint in April 2003. Herndon had performed all of the work required to earn the disputed commissions, and his right to the commissions had vested prior to his termination. The payment of those commissions was subject only to ULC's receipt of the customer's payments. Thus, we hold that Herndon is entitled to liquidated damages and attorney's fees under Indiana Code Section 22–2–5–2.

Affirmed.

KIRSCH, C.J., and VAIDIK, J., concur.