

FILED

Apr 11 2016, 9:20 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANTS

Ronald E. Weldy
Weldy Law
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Bonnie L. Martin
Steven F. Pockrass
Ogletree, Deakins, Nash, Smoak &
Stewart, P.C.
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Dorothea Bragg, on Behalf of Herself and All Others Similarly Situated,<br><br>*Appellants-Plaintiffs,*<br><br>v.<br><br>Kittle's Home Furnishings, Inc.,<br><br>*Appellee-Defendant.* | April 11, 2016<br><br>Court of Appeals Case No. 49A02-1506-PL-653<br><br>Appeal from the Marion Superior Court<br><br>The Honorable Heather A. Welch<br><br>Trial Court Cause No. 49D01-1406-PL-18569 |

**Bradford, Judge.**

## Case Summary

[1]     Appellant-Plaintiff Dorothea Bragg was employed as a retail sales consultant by Appellee-Defendant Kittle's Home Furnishings, Inc. ("Kittle's") from November of 2011 until September of 2013. Pursuant to the terms of Bragg's

employment, Bragg earned a regular bi-weekly salary. She also had the potential to earn additional compensation, in the form of commission, if she completed a certain level of delivered sales. Bragg voluntarily terminated her employment at Kittle's in September of 2013.

[2] On June 4, 2014, Bragg, both on behalf of herself and on behalf of a proposed class of unknown current and former Kittle's employees (the "unknown purported class members"), filed a lawsuit against Kittle's. In this lawsuit, Bragg alleged that Kittle's had failed to pay its employees earned commissions within the ten-day limit set forth in the Indiana Wage Payment Statute (the "Wage Payment Statute"). Of note, Bragg did not allege that Kittle's had failed to pay her or any of the other unknown purported class members any commissions actually earned by the employees, only that Kittle's failed to do so within the ten-day limit set forth in the Wage Payment Statute.

[3] Kittle's subsequently filed a motion to dismiss the lawsuit. With respect to the claims relating to any of the unknown purported class members whose employment had been involuntarily terminated by Kittle's, the trial court granted Kittle's motion to dismiss for lack of subject matter jurisdiction. With respect to the claims relating to Bragg, and seemingly any potential remaining unknown purported class members, the trial court converted Kittle's motion to dismiss into a motion for summary judgment. After the parties submitted designated evidence and legal argument in support on their position on Kittle's motion for summary judgment, the trial court granted summary judgment in favor of Kittle's.

[4] Upon review, we conclude that (1) the trial court lacked subject matter jurisdiction over the claims raised on behalf of any unknown purported class members whose employment with Kittle's was involuntarily terminated because said unknown purported class members failed to first submit their claims to the Indiana Department of Labor ("DOL") as required by the Indiana Wage Claims Statute ("Wage Claims Statute"); (2) the trial court did not abuse its discretion in denying certain discovery requests made by Bragg. We therefore affirm the judgment of the trial court; and (3) the trial court properly granted summary judgment in favor of Kittle's on the claims raised by Bragg and any remaining unknown purported class members because the ten-day time limit set forth in the Wage Payment Statute did not apply to the commissions at issue as said commissions did not qualify as wages under the Wage Payment Statute.

## Facts and Procedural History

[5] Beginning on or about November 29, 2011, Bragg was employed as a retail sales consultant at the Kittle's store located in Fort Wayne. Bragg continued to be employed by Kittle's until she resigned from her position on September 1, 2013.

[6] As a retail sales consultant, Bragg received "chargeable draws toward anticipated future commissions on a bi-weekly basis." Appellee's App. p. 36. These "draws" were based on the number of hours Bragg worked each week "multiplied by a pre-determined rate per hour, thus providing her with a regular

and predictable stream of income every two weeks." Appellee's App. p. 36. The draws were considered "chargeable" because "they counted toward the commissions that Bragg received based on her delivered sales for the prior month." Appellee's App. p. 36. "In the event that the commissions calculated on Bragg's delivered sales for the prior month … exceeded her chargeable draw, [Bragg] received the excess in the form of a commission check." Appellee's App. p. 36. If the amount of delivered sales did not exceed Bragg's chargeable draw, "then [Bragg] would not have received a commission check that month, but Kittle's also would not have required her to write a check or make some other form of payment to Kittle's that month to cover the difference, nor would Kittle's have reduced her future draws." Appellee's App. p. 36.

[7] It is undisputed that Bragg received commission payments on July 27, 2012, August 24, 2012, September 21, 2012, October 16, 2012, November 16, 2012, December 28, 2012, January 25, 2013, February 22, 2013, March 22, 2013, April 19, 2013, May 17, 2013, June 28, 2013, July 26, 2013, August 23, 2013, September 20, 2013, and October 18, 2013. It is also undisputed that on these dates, Kittle's paid all commissions owed to Bragg.

[8] On June 4, 2014, Bragg filed a complaint for damages, alleging a purported class action under the Wage Payment Statute on behalf of current and former employees of Kittle's who had received "late payments of commissions on or after May 30, 2012." Appellee's App. p. 3. Bragg was the only named plaintiff identified. The complaint did not allege that any amounts remained unpaid as of the date of the initiation of the law suit. The complaint also did not indicate

that Bragg or any of the unknown purported class members received a referral from the DOL for his or her claims.

[9] On August 13, 2014, Kittle's filed a motion to dismiss Bragg's complaint. In this motion, Kittle's sought dismissal on the grounds that the trial court lacked subject matter jurisdiction over the claims of any involuntarily terminated unknown purported class members who failed to exhaust the administrative remedies provided by the DOL. Kittle's also sought dismissal on the grounds that Bragg's commissions did not qualify as wages under the Wage Payment Statute. On October 27, 2014, the trial court issued an order converting the portion of Kittle's motion to dismiss relating to the issue of whether Bragg's commissions qualified as wages under the Wage Payment Statute to a motion for summary judgment and allowed the parties to conduct discovery on the wage issue for summary judgment briefing.[1]

[10] The trial court scheduled a hearing on Kittle's motion to dismiss for December 5, 2014. Approximately five days before the hearing, on Sunday, November 30, 2014, Bragg issued subpoenas to certain DOL personnel to appear at the December 5, 3014 hearing. Bragg sought to have the DOL personnel give testimony, which she believed might provide evidence which could be used in opposition to Kittle's motion to dismiss. On December 4, 2014, the Indiana

---

[1] This ruling would also seem to apply to the claims of any unknown purported class members who were either employed by Kittle's at the time Bragg initiated the instant lawsuit or who had voluntarily terminated their employment at Kittle's.

Attorney General's Office filed a motion to quash the subpoenas. The trial court subsequently vacated the December 5, 2014 hearing date.

[11] On December 10, 2014, the trial court granted the Attorney General's motion to quash. Bragg filed a motion to reconsider this order on January 5, 2015. The trial court denied Bragg's motion to reconsider on January 9, 2015. Bragg filed a motion requesting permission to depose the DOL personnel on January 29, 2015. This request was denied by the trial court on February 2, 2015.

[12] On March 13, 2015, the trial court issued an order granting the motion of Kittle's to dismiss with respect to any unknown purported class members whose employment was involuntarily terminated, finding it lacked subject matter jurisdiction over such claims. On May 18, 2015, the trial court granted summary judgment in favor of Kittle's, finding that, as a matter of law, the commissions paid to Bragg did not qualify as wages under the Wage Payment Statute.[2] This appeal follows.

## Discussion and Decision

[13] On appeal, Bragg challenges the trial court's order dismissing the claims raised on behalf of the unknown purported class members whose employment was involuntarily terminated by Kittle's. Bragg alternatively challenges the trial

---

[2] Again, this ruling would also seemingly apply to any remaining unknown purported class members.

court's denial of a discovery request made on behalf of the unknown purported class members whose employment was involuntarily terminated by Kittle's. Bragg last challenges the trial court's order granting summary judgment in favor of Kittle's as to her claim against Kittle's and those raised by any remaining unknown purported class members. We will review each challenge separately.

# I. Motion to Dismiss

[14] Bragg, on behalf of the unknown purported class members whose employment was involuntarily terminated by Kittle's, challenges the trial court's order granting Kittle's motion to dismiss. "Our review of a trial court's ruling on an Indiana Trial Rule 12(B)(1) motion to dismiss where the facts before the trial court are undisputed, as here, is de novo." *Hollis v. Def. Sec. Co.*, 941 N.E.2d 536, 537 (Ind. Ct. App. 2011) (citing *Reel v. Clarian Health Partners, Inc.*, 917 N.E.2d 714, 717-18 (Ind. Ct. App. 2009), *trans. denied*), *trans. denied*.

[15] In granting Kittle's motion to dismiss, the trial court found that it did not have subject matter jurisdiction over any unknown purported class members whose employment with Kittle's was involuntarily terminated, because said unknown purported class members had failed to exhaust their administrative remedies pursuant to the Wage Claims Statute before filing the underlying lawsuit. In challenging the trial court's order, Bragg claims that the unknown purported class members were not required to exhaust any administrative remedies because they properly brought suit under the Wage Payment Statute, rather than the Wage Claims Statute. Bragg alternatively argues that the failure to

exhaust administrative remedies should be excused because the exercise of the applicable administrative remedies would be futile.

## A. Whether the Wage Payment Statute or the Wage Claims Statute Applies

[16]     Bragg claims that the trial court erroneously determined that the Wage Claims Statute applies to any unnamed purported class members whose employment with Kittle's was involuntarily terminated. In raising this claim, Bragg asserts that the question of which statute applies "is a matter of first impression because the issue has barely been analyzed to date by any appellate court." Appellant's Br. p. 15. However, we find this assertion curious, to say the least, because even a cursory review of relevant Indiana authority indicates that the appellate courts have considered this issue, on the merits, on numerous occasions. *See Treat v. Tom Kelley Buick Pontiac GMC, Inc.*, 646 F.3d 487, 489-492 (7th Cir. 2011); *Walczak v. Labor Works-Ft. Wayne LLC*, 983, N.E.2d 1146, 1149 (Ind. 2013); *St. Vincent Hosp. and Health Care Center, Inc. v. Steele*, 766 N.E.2d 699, 705 (Ind. 2002); *Hollis*, 941 N.E.2d at 537-540; *Gavin v. Calcars AB, Inc.*, 938 N.E.2d 1270, 1271-72 (Ind. Ct. App. 2010), *trans. denied*. The assertion is also curious because counsel for Bragg was also counsel of record on at least three of the prior cases where this specific issue has been analyzed by appellate courts, and therefore would have first-hand knowledge that this issue had, in fact, been decided. *See Treat*, 646 F.3d at 489-492; *Hollis*, 941 N.E.2d at 537-540; *Gavin*, 938 N.E.2d at 1271-72.

[17]     Be that as it may, in considering whether the Wage Payment Statute or the Wage Claims Statute applies to a plaintiff's claim, the Indiana Supreme Court determined that "[a]lthough both the Wage Claims Statute and the Wage Payment Statute set forth two different procedural frameworks for wage disputes, each statute applies to different categories of claimants." *Steele*, 766 N.E.2d at 705; *see also Hollis*, 941 N.E.2d at 538-540; *Gavin*, 938 N.E.2d at 1272. In reaching this determination, the Indiana Supreme Court observed that:

> The Wage Claims Statute references employees who have been separated from work by their employer and employees whose work has been suspended as a result of an industrial dispute. I.C. § 22-2-9-2(a)(b). By contrast, the Wage Payment Statute references current employees and those who have voluntarily left employment, either permanently or temporarily. I.C. § 22-2-5-1(b).

*Steele*, 766 N.E.2d at 705. We have subsequently applied the Indiana Supreme Court's decision in *Steele* in both *Hollis* and *Gavin*. *See Hollis*, 941 N.E.2d at 538-540; *Gavin*, 938 N.E.2d at 1272.

[18]     Further, in reviewing the relevant Indiana authority regarding whether the Wage Payment Statute or Wage Claims Statute applied to a plaintiff's claim, the Seventh Circuit has noted that "both of these statutes, and questions about their application, have received substantial attention from the Indiana state courts." *Treat*, 646 F.3d at 488. The Seventh Circuit cited to the Indiana Supreme Court's decision in *Steele* and our conclusions in *Hollis* and *Gavin*, stating:

> The language of the Indiana Code suggests, and the Indiana state courts have repeatedly confirmed, that the [Wage] Payment Statute provides an avenue for relief to employees seeking unpaid wages who voluntarily leave their employment or who remain employed and whose wages are overdue. The [Wage] Claims Statute, on the other hand, applies to employees seeking unpaid wages after their employer has fired them.

*Id*. at 490.

[19] Contrary to Bragg's claim, multiple appellate tribunals have considered whether the Wage Payment Statute or the Wage Claims Statute applies to a plaintiff's cause of action. Each of these tribunals makes it clear that an employee's status at the time he or she files the claim is the relevant inquiry in determining whether to proceed under the Wage Payment Statute or the Wage Claims Statute. *See Treat*, 646 F.3d at 489-492; *Walczak*, 983, N.E.2d at 1149; *Steele*, 766 N.E.2d at 705; *Hollis*, 941 N.E.2d at 537-540; *Gavin*, 938 N.E.2d at 1271-72. Thus, where a potential plaintiff's employment was involuntarily terminated by their former employer, the applicable authority is clear, the Wage Claims Statute applies. *See Treat*, 646 F.3d at 489-492; *Hollis*, 941 N.E.2d at 537-540; *Gavin*, 938 N.E.2d at 1271-72.

[20] Therefore, we conclude that the Wage Claims Statute applies to the unknown purported class members whose employment was involuntarily terminated by Kittle's. These unknown purported class members were therefore required to exhaust the administrative remedy provided in the Wage Claims Statute by first submitting their claims to the DOL. *Steele*, 766 N.E.2d at 705. They did not do

so. Instead, Bragg, again on behalf of these unknown purported class members, improperly filed a complaint based on the Wage Payment Statute in the trial court. Because these unknown purported class members did not first submit their claims to the DOL as is required by the Wage Claims Statute, we conclude the trial court properly dismissed the claims raised by Bragg on behalf of the unknown purported class members whose employment was involuntarily terminated by Kittle's. *See Hollis*, 941 N.E.2d at 540 (providing that because the Wage Claim Statute applied to plaintiff's claims and plaintiff did not allege any Wage Claims Statute claims or submit his claims to the DOL, the trial court properly dismissed plaintiff's claims).

## B. Whether Failure to Exhaust Administrative Remedies Should Be Excused

[21] Again, plaintiffs who proceed under the Wage Claims Statute may not file a complaint with the trial court but rather must first submit a claim to the DOL. *Lemon v. Wishard Health Servs.*, 902 N.E.2d 297, 300 (Ind. Ct. App. 2009), *trans. denied*. Once a claim has been submitted to the DOL, the DOL's responsibility is described as follows:

> (a) It shall be the duty of the commissioner of labor to enforce and to insure compliance with the provisions of this chapter, to investigate any violations of any of the provisions of this chapter, and to institute or cause to be instituted actions for penalties and forfeitures provided under this chapter. The commissioner of labor may hold hearings to satisfy himself as to the justice of any claim, and he shall cooperate with any employee in the enforcement of any claim against his employer in any case whenever, in his opinion, the claim is just and valid.

> (b) *The commissioner of labor may refer claims for wages under this chapter to the attorney general, and the attorney general may initiate civil actions on behalf of the [plaintiff] or may refer the claim to any attorney admitted to the practice of law in Indiana.* The provisions of IC 22-25-2 apply to civil actions initiated under this subsection by the attorney general or his designee.

*Id.* (quoting Ind. Code § 22-2-9-4) (emphasis in original). "It is evident that the Wage Claims Act contemplates that a [plaintiff] must approach the DOL before he or she is entitled to file a lawsuit in court to seek unpaid wages or penalties." *Id.* "The DOL is then entitled to investigate the claim and refer the claim to the Attorney General, who may either institute an action on the [plaintiff's] behalf or refer the claim to an attorney." *Id.* at 300-01.

[22] In concluding that a plaintiff seeking redress pursuant to the Wage Claims Statute must first submit the claim to the DOL before filing a lawsuit in court, we observed that "[t]he statute makes it clear that a claim must work its way through the proper channels—the DOL and, if need be, the Attorney General—before it may be brought into court." *Id.* at 301. We further observed that "the plain language of the Wage Claims [Statute] requires that the letter be obtained—and the administrative process followed—before the lawsuit is filed." *Id.* at 302.

[23] We applied our conclusion in *Lemon* to our opinion in *Reel v. Clarian Health Partners, Inc.*, 917 N.E.2d 714, 720 (Ind. Ct. App. 2009), *trans. denied*, in which we stated the following:

> We agree with *Lemon* that a [plaintiff] seeking redress pursuant to the Wage Claims Statute must first submit the claim to the DOL before he or she is entitled to file a lawsuit in court and that the act of filing a putative class action does not enable the putative class members to subvert the statutory requirements. Therefore, we conclude that the trial court properly granted Clarian's Trial Rule 12(B)(1) motion to dismiss the purported wages claims of the proposed class of plaintiffs who had not sought review and referral pursuant to Indiana Code section 22-2-9-4. That is, because these proposed class members did not first pursue administrative proceedings, the trial court did not have subject matter jurisdiction over their purported wage claims.

(Footnote omitted).

[24] Despite our conclusions in *Lemon* and *Reel*, Bragg argues that the unknown purported class members' failure to first submit any potential claims to the DOL should be excused.[3] In support of this argument, Bragg asserts that submitting the potential claims to the DOL would be futile. We disagree.

[25] In making the futility argument, Bragg cites to our opinion in *Fox v. Nichter Construction Co.*, 978 N.E.2d 1171 (Ind. Ct. App. 2012), *reh'g denied*. In *Fox*, we outlined the DOL's policies and powers, stating, in relevant part, the following:

> According to the DOL … [b]y statute, when the wage claim is submitted to the DOL it then becomes "the duty of the commissioner of labor to enforce and to insure compliance with

---

[3] We note that counsel for Bragg was also counsel for the plaintiffs involved in both *Lemon* and *Reel*. *See Lemon*, 902 N.E.2d at 298; *Reel*, 917 N.E.2d at 715.

the provisions of this chapter, to investigate any violations of any of the provision of this chapter, and to institute or cause to be instituted actions for penalties and forfeitures provided under this chapter." Ind. Code § 22-2-9-4(a). The DOL Commissioner may exercise the duty, or "may refer claims for wages under this chapter to the attorney general, and the attorney general may institute civil actions on behalf of the claimant or may refer the claim to any attorney admitted to the practice of law in Indiana." Ind. Code § 22-2-9-4(b).

If the DOL chooses to resolve the claim instead of making a referral … the DOL notifies the employer of the claim in writing…. If neither the [plaintiff] nor the DOL receives a response from the employer [within two weeks], then a final notice is sent to the employer providing for a one-week period of time in which to respond. [Indiana Department of Labor, *Online Wage Claim Form*, http://www.in.gov//dol/2734.htm (last visited Oct. 3, 2012)]. If the employer fails to respond to the final notice, then the DOL sends a copy of the wage claim file to the [plaintiff] along with a letter recommending that the [plaintiff] consult with an attorney or pursue the claim in court. *Id*.

If the employer disputes the claim, however, the DOL will make a determination based upon the law and the documentation provided by the parties. *Id*. … It is the DOL's position that the determination does not represent formal findings, nor is it binding on the parties. If the DOL cannot make a determination, the [plaintiff] "will receive notice along with a letter recommending that [he or she] consult an attorney or pursue [the] claim in the appropriate court." *Id*.

The DOL contends that it does not provide a formal claim resolution process and is not required to do so by law. The DOL considers the administrative process it provides to be more in the nature of mediation than a formal administrative review, and is not subject to judicial review.

Although the [plaintiffs] who are involuntarily separated from their employment must submit their claim to the DOL first before proceeding to court, it is the DOL's practice to accept all claims regardless of whether they arise under the Wage Claims Statute or the Wage Payment Statute. [*Steele*], 766 N.E.2d at 705 (claimant under Wage Claims Statute must submit claim first with DOL). The DOL has adopted this approach because it is consistent with the DOL's statutory authority and promotes judicial economy by allowing all wage claimants the opportunity to resolve their wage disputes at the administrative level first.… The DOL argues that it benefits both the parties and trial courts to allow all [plaintiffs] to attempt to resolve their disputes administratively. When the DOL is able to resolve the claims to the satisfaction of both the [plaintiff] and the employer, then there is no need to present the claim in court.

**\*\*\*\***

The DOL's position is that when it is unable to resolve the claim, the claimant "will receive notice along with a letter recommending [he or she] consult an attorney or pursue [the] claim in the appropriate court." Indiana Department of Labor, *Online Wage Claim Form*, http://www.in.gov//dol/2734.htm (last visited Oct. 3, 2012).

*Id*. at 1177-78 (some brackets in original, some added). Bragg points to the above-quoted language and claims that "[g]iven that the DOL has no investigative or enforcement apparatus, then if any of the proposed involuntarily separated Class Members had filed their claims with the DOL, then it would clearly had not benefited them in any manner. The DOL could not provide these wage claimants with a remedy or otherwise perform any meaningful task with regard to their wage claims." Appellant's Br. p. 23. We, however, find Bragg's interpretation of *Fox* to be inaccurate.

[26]     Contrary to Bragg's interpretation, we read *Fox* to provide that once a claim is submitted to the DOL, the DOL has the power to work with the parties to try to resolve the claim, refer the matter to the attorney general, or provide the plaintiff with a recommendation to pursue the matter in the appropriate court. Each of these actions can provide a benefit to the plaintiff. Further, we observe that in attempting to resolve matters, the DOL acts in a manner similar to a mediator and engages in efforts to help the parties resolve their dispute without the need for litigation. The DOL's policies and procedures promote judicial economy by allowing all wage claimants the opportunity to resolve their wage disputes at the administrative level first before engaging in the often time-consuming and expensive process of litigation. As such, we cannot agree with Bragg's broad assertion that submission of any claims brought under the Wage Claims Statute to the DOL would be futile.

[27]     For the foregoing reasons, we decline Bragg's request to excuse the unknown purported class members' failure to first submit their possible claims to the DOL. As we concluded in *Reel*, we again conclude that in light of the unknown purported class members' failure to exhaust their administrative remedies, the trial court did not have subject matter jurisdiction over the purported wage claims at issue. 917 N.E.2d at 720. We therefore further conclude that the trial court properly granted the Trial Rule 12(B)(1) motion by Kittle's to dismiss the claims raised on behalf of the unknown purported class members whose employment was involuntarily terminated by Kittle's. *See id*.

# II. Denial of Discovery Request

[28] Bragg alternatively argues that the trial court abused its discretion in denying her request to depose certain DOL personnel in an attempt to gain evidence which she believes may have bolstered her futility argument.

> A trial court has broad discretion in ruling upon discovery issues, and we will interfere only where an abuse of discretion is apparent. [*Brown v. Dobbs*, 691 N.E.2d 907, 909 (Ind. Ct. App. 1998)]. An abuse of discretion occurs only where the trial court's decision is against the logic and natural inferences to be drawn from the facts of the case. *Id.* Due to the fact-sensitive nature of discovery matters, a trial court's ruling is cloaked with a strong presumption of correctness on appeal. *Id.*

*Riggin v. Rea Riggin & Sons, Inc.*, 738 N.E.2d 292, 308 (Ind. Ct. App. 2000).

[29] Bragg fails to point to any specific information which she believes that she would have been likely to gain by deposing the requested DOL personnel. Instead, her request seems to represent little more than a fishing expedition for some unknown piece of information which may, or may not, exist. As such, we conclude that the trial court did not abuse its discretion in denying Bragg's request to depose certain DOL personnel in an attempt to gain evidence which she believes may have bolstered her futility argument.[4]

---

[4] Because we conclude that the trial court did not abuse its discretion in denying Bragg's request to depose certain requested DOL personnel, we need not consider Bragg's alternative argument that the trial court could have converted the motion by Kittle's to dismiss to a

# III. Summary Judgment Order

[30] Initially, we note that our analysis below is framed as whether the commissions paid to Bragg qualified as wages under the Wage Payment Statute. The same analysis, however, would apply to the commissions earned by any possible remaining unknown purported class member who was either employed by Kittle's at the time Bragg filed the underlying lawsuit or who voluntarily terminated their employment at Kittle's. Therefore, our resolution of Bragg's claims also resolves any claims raised on behalf of any possible remaining unknown purported class members.

## A. Standard of Review

[31]
> The purpose of summary judgment is to terminate litigation about which there can be no factual dispute and which may be determined as a matter of law. *Bushong v. Williamson*, 790 N.E.2d 467 (Ind. 2003). On appeal, our standard of review is the same as that of the trial court. Summary judgment is appropriate only where the evidence shows there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Olds v. Noel*, 857 N.E.2d 1041 (Ind. Ct. App. 2006). "All inferences from the designated evidence are drawn in favor of the nonmoving party." *Hartman v. Keri*, 883 N.E.2d 774, 777 (Ind. 2008).

*McCausland v. Walter USA, Inc.*, 918 N.E.2d 420, 423-24 (Ind. Ct. App. 2009). Review of an order granting summary judgment is limited to those materials

motion for summary judgment if it had permitted Bragg to depose the requested DOL personnel.

designed in the trial court. *Naugle v. Beach Grove City Schs.*, 864 N.E.2d 1058, 1062 (Ind. 2007). While specific findings of fact and conclusions thereon are not required, such findings, although not binding, may nonetheless aid our review of a trial court's summary judgment order. *Quezare v. Byrider Fin., Inc.*, 941 N.E.2d 510, 513 (Ind. Ct. App. 2011), *trans. denied*. Further, we may affirm a trial court's order granting a motion for summary judgment on any grounds supported by the designated materials. *Id.*

## B. The Wage Payment Statute

[32] The Wage Payment Statute, which is codified at Indiana Code sections 22-2-5-1 through 22-2-5-3, governs both the amount and the frequency with which an employer must pay its employees. *McCausland*, 918 N.E.2d at 424 (citing *Naugle*, 864 N.E.2d at 1062)). Specifically, Indiana Code section 22-2-5-1 provides, in relevant part, as follows:

> (a) Every person, firm, corporation, limited liability company, or association, their trustees, lessees, or receivers appointed by any court, doing business in Indiana, shall pay each employee at least semimonthly or biweekly, if requested, the amount due the employee. The payment shall be made in lawful money of the United States, by negotiable check, draft, or money order, or by electronic transfer to the financial institution designated by the employee. Any contract in violation of this subsection is void.

> (b) Payment shall be made for all wages earned to a date not more than ten (10) business days prior to the date of payment.

Indiana Code section 22-2-5-2 provides that if an employer fails to comply with the ten-day requirement set forth in Indiana Code section 22-2-5-1(b):

Every such person, firm, corporation, limited liability company, or association who shall fail to make payment of wages to any such employee as provided in section 1 of this chapter shall be liable to the employee for the amount of unpaid wages, and the amount may be recovered in any court having jurisdiction of a suit to recover the amount due to the employee. The court shall order as costs in the case a reasonable fee for the plaintiff's attorney and court costs. In addition, if the court in any such suit determines that the person, firm, corporation, limited liability company, or association that failed to pay the employee as provided in section 1 of this chapter was not acting in good faith, the court shall order, as liquidated damages for the failure to pay wages, that the employee be paid an amount equal to two (2) times the amount of wages due the employee.

## C. Whether Commission Earned by Bragg Qualifies as "Wages" Under the Wage Payment Statute

[33] In claiming that the trial court erred in granting summary judgment in favor of Kittle's, Bragg argues that the designated evidence raises an issue of material fact as to whether Kittle's violated the ten-day rule set forth in the Wage Payment Statute by failing to pay Bragg certain commissions within the required ten-day period. Kittle's, for its part, argues that no issue of material fact remains because the commissions at issue did not qualify as wages under the Wage Payment Statute. Our resolution of this claim on appeal therefore turns on the question of whether, as a matter of law, Bragg's commissions constituted wages as the term is used in the Wage Payment Statute.

[34] Although the Wage Payment Statute does not define the term wages, the Wage Claims Act, again, codified at Indiana Code sections 22-2-9-1 through 22-2-9-8,

defines the term wages as follows: "all amounts at which the labor or service rendered is recompensed, whether the amount is fixed or ascertained on a time, task, piece, or commission basis, or in any other method of calculating such amount."[5] It is well-established that in determining whether a method of compensation constitutes wages for purposes of the Wage Payment Statute, the name given to the method of compensation is not controlling. *See Thomas v. H & R Block E. Enters., Inc.*, 630 F.3d 659, 664 (7th Cir. 2011); *Sheaff Brock Inv. Advisors, LLC v. Morton*, 7 N.E.3d 278, 285 (Ind. Ct. App. 2014); *Quezare*, 941 N.E.2d at 514; *McCausland*, 918 N.E.2d at 424; *Davis v. All Am. Siding & Windows, Inc.*, 897 N.E.2d 936, 943 (Ind. Ct. App. 2008), *trans. denied*; *Kopka, Landau & Pinkus v. Hansen*, 874 N.E.2d 1065, 1072 (Ind. Ct. App. 2007); *Gress v. Fabcon, Inc.*, 826 N.E.2d 1, 3 (Ind. Ct. App. 2005).

> Rather, we will consider the substance of the compensation to determine whether it is a wage, and therefore subject to the Wage Payment Statute. [*Gurnik v. Lee*, 587 N.E.2d 706, 709 (Ind. Ct. App. 1992)]. We have recognized that wages are "something akin to the wages paid on a regular periodic basis for regular work done by the employee...." *Wank v. St. Francis College*, 740 N.E.2d 908, 912 (Ind. Ct. App. 2000). In other words, if compensation is not linked to the amount of work done by the employee or if the compensation is based on the financial success

---

[5] As is discussed above, the Wage Claims Act relates to disputes over wages owed to an employee whose employment has been terminated or suspended as a result of a labor dispute. *See* Ind. Code § 22-2-9-2.

of the employer, it is not a "wage." *Pyle v. Nat'l Wine & Spirits Corp.*, 637 N.E.2d 1298, 1300 (Ind. Ct. App. 1994).

*Gress*, 826 N.E.2d at 3. "Moreover, because the Wage Payment Statute imposes a penalty when wages are not paid within ten days of the date they are 'earned,' it is not practical to apply the statute to payments that cannot be calculated within ten days after being earned." *McCausland*, 918 N.E.2d at 424 (citing *Highhouse v. Midwest Orthopedic Inst.*, 807 N.E.2d 737, 740 (Ind. 2004)).

[35]   In *Thomas*, the United States Court of Appeals for the Seventh Circuit (the "Seventh Circuit") noted that "Indiana courts consider a variety of factors to guide their determination of whether compensation … constitutes a wage." 630 F.3d at 664. For instance, the Seventh Circuit noted that "Indiana courts are more likely to find compensation a wage if it is 'not linked to a contingency.'" *Id*. (quoting *Naugle*, 864 N.E.2d at 1067). In this vein, the Seventh Circuit noted that the Indiana Supreme Court has explained that "payment contingent on factors outside of an employee's or employer's control 'is not consistent with the time constraints imposed by the Wage Payment Statute' … [and that] compensation is less likely to constitute a wage when it is difficult to calculate and pay within ten days after it was earned." *Id*. (quoting *Highhouse*, 807 N.E.2d at 740). The Seventh Circuit further noted that Indiana Courts also consider whether (1) the compensation directly relates to the time that an employee works, (2) wages are paid on a regular periodic basis for regular work done by the employee, and (3) the compensation in question is paid in addition to wages. *Id*.

## 1. Discussion of Relevant Authority

### i. Thomas

[36] In *Thomas*, the Seventh Circuit considered whether end-of-season commission payments paid to Thomas by H&R Block qualified as "wages" under Indiana's Wage Payment Statute. Thomas worked as a seasonal employee for H&R Block, responsible for preparing clients' tax returns and offering other financial products and services that H&R Block provides. *Thomas*, 630 F.3d at 662. As a result of her seasonal employment with H&R Block, Thomas was eligible for two forms of compensation, an hourly wage and potential end-of-season compensation. *Id*. Thomas was eligible for end-of-season compensation "only if the sum of various specified amounts exceeded the aggregate gross hourly wages paid to her during the tax season." *Id*. Thomas was subsequently determined to be eligible for additional end-of-season compensation, after which H&R Block paid Thomas the applicable amount of end-of-season compensation. *Id*. at 663. Thomas later sued H&R Block arguing that although it had paid her all compensation owed to her, it had failed to do so within ten days as is required by the Indiana Wage Payment Statute. *Id*.

[37] The Seventh Circuit found that Thomas's end-of-season compensation was dependent on factors other than her efforts as a portion of the compensation was based on the contingency of collecting from customers. *Id*. at 666. In finding this to be a relevant contingency worthy of consideration, the Seventh Circuit noted that the "Indiana Supreme Court has not limited relevant contingencies to business performance and that imposing such a limit would be

contrary to Indiana case law." *Id.* at 667. The Seventh Circuit also found that Thomas's end-of-season compensation was not directly related to the time she worked, noting that because the end-of-season compensation was partially based on collections, Thomas could theoretically have worked for an entire tax season without earning any end-of-season compensation. *Id.* at 666. Thomas also received an hourly wage in addition to any potentially earned end-of-season compensation. *Id.* In addition, the Seventh Circuit found that it was "at least difficult, if not impossible" to calculate the compensation within the ten-day period. *Id.*

### ii. Gress

[38] In *Gress*, we considered whether commissions paid to Gress by Fabcon qualified as "wages" under the Wage Payment Statute. Upon review, we found that Gress was employed by Fabcon as a sales engineer, regional sales manager, and national accounts manager. *Gress*, 826 N.E.2d at 1-2. His general job responsibilities included soliciting and developing new business for Fabcon; bidding/negotiating contracts; and participating in each of his projects through the final project billing, collection, and closure. *Id.* at 2. Gress was paid on both a salary and a commission basis. *Id.*

[39] The commission payments at issue in *Gress* were paid on a monthly basis and represented either unearned advance payment for jobs shipped but not completed or final earned commissions on jobs for which all costs had been paid and actual profitability had been determined. *Id.* The commission payments fluctuated from month to month depending on the degree of activity

on Gress's jobs, whether projects were closed out, and whether projects were profitable. *Id.* The amount of any tendered future advance payments was based off of anticipated profitability. *Id.* Once a project was "closed out," the final commission was calculated and any sums due to the salesperson were paid. *Id.* A job was closed out when the accounting department determined that all job costs had been paid, the final payment had been received, and the actual profitability of the project could be determined. *Id.* This process could take anywhere from several months to a couple of years after shipment. *Id.* If a project was less profitable than anticipated, Gress might not receive any additional commission. *Id.* Further, if Fabcon lost money or earned no profit on the project, Gress was required to reimburse Fabcon for some or all of the advance payment which had been tendered to him. *Id.*

[40]     In determining whether Gress's commissions qualified as "wages" under the Wage Payment Statute, we found as follows:

> Fabcon's commission program is based upon the profitability of the salesperson's individual projects. The salesperson earns no commission if the project does not result in a profit for Fabcon. The payment of commissions was not directly linked to the amount of work performed by Gress. To be sure, a salesperson could work for an entire year without earning any commissions if none of the projects were profitable. Moreover, although the commissions were paid once each month, the payments were based on the previous month's accounting events for the project—whether all job costs had been paid, whether the job had "closed out," and whether any determination had been made with respect to profitability—rather than on work performed by Gress in the previous month. In short, because of the length of

time involved in determining the final commission, it was simply impossible for Fabcon to know what Gress was owed within ten days.

*Id*. at 4 (internal record citations omitted). In light of all these factors, we concluded that Gress's commissions were not "wages" within the purview of the Indiana Wage Payment Statute. *Id*.

### *iii.* McCausland

In *McCausland*, we considered whether certain commissions paid to McCausland by Walter USA qualified as "wages" under the Wage Payment Statute. McCausland was employed as a direct sales manager for Walter USA, and was primarily responsible for managing salespeople and assisting them in making sales for the company. 918 N.E.2d at 422. He received compensation in the form of salary, commissions, and bonuses. *Id*. at 422-23. His commissions were dependent on the net sales for his district. *Id*. at 423. McCausland's employment with Walter USA was terminated on April 1, 2007. *Id*. On September 17, 2007, McCausland filed suit against Walter USA alleging that he was entitled to damages under the Wage Payment Statute. *Id*. Specifically, McCausland argued that although Walter USA had paid him all commissions and bonuses due to him, Walter USA had failed to do so in within the time requirements of the Wage Payment Statute. *Id*. The trial court subsequently granted summary judgment in favor of Walter USA. *Id*.

Upon review, we concluded as follows:

McCausland's commissions were based on the success of the salespeople he managed. While McCausland assisted the salespeople he managed in making sales, ultimately, those sales were directly attributable to a salesperson, and not McCausland. In other words, McCausland's commissions were not directly linked to his own efforts. Moreover, the commissions were not based on gross sales, but on "net sales" which required a calculation of not only the gross sales but also other reductions, such as discounts and returns, which McCausland had little control over. Finally, McCausland's commission could not be accurately calculated until Walter received all point of sales information from its distributors. Because McCausland's commissions were based on the efforts of his sales team and "net sales," and the commissions could not always be calculated within the statutorily mandated ten-days, we conclude that the commissions were not "wages" within the meaning of the Wage Payment Statute.

*Id.* at 426.

### iv. Quezare

In *Quezare*, we considered whether certain bonuses paid to Quezare by Byrider qualified as "wages" under the Wage Payment Statute. Byrider employed Quezare as a collections account representative. 941 N.E.2d at 511. As part of his employment, Quezare managed 290 accounts, each consisting of a loan on a vehicle sold by Byrider's sister corporation, J.D. Byrider. *Id.* Queazre was teamed with four other account representatives and their primary responsibility was to prevent the accounts covered by their team from becoming delinquent. *Id.* Quezare was paid an hourly salary. *Id.* In addition, he was paid certain bonuses or commissions if less than a certain percentage of his accounts were

delinquent. *Id.* Quezare subsequently filed suit against Byrider alleging that he was entitled to damages under the Wage Payment Statute. *Id.* Specifically, Quezare argued that although Byrider had paid him all bonuses due to him, Byrider had failed to do so in within the time requirements of the Wage Payment Statute. *Id.* The trial court subsequently granted summary judgment in favor of Byrider. *Id.*

[44] With respect to the bonuses based on the percentage of the team accounts, we concluded that because the bonuses were dependent on the efforts of the team, those benefits did not constitute wages for purposes of the Wage Payment Statute. *Id.* at 514. With respect to the bonuses based on Quezare's individual accounts, we concluded that even though the bonuses were calculated on a weekly basis, they were not earned merely by working for a week. *Id.*

> Rather, the bonuses [were] awarded only if the account delinquency goals [were] met. Thus, they [were] not necessarily paid on a regular basis. If the delinquency rate of an employee's accounts [was] greater than the bonus percentage month after month, that employee will not earn any bonuses. Indiana courts have consistently stated that a bonus is a wage under the Wage Payment Statute if the bonus directly relates to the time that an employee works, is paid with regularity, and is not dictated by the employer's financial success. [*Tobin v. Ruman*, 819 N.E.2d 78, 88 (Ind. Ct. App. 2004), *trans. denied*]; [*Pyle*, 637 N.E.2d at 1299-1300].
>
> In addition, we note that Byrider's bonus plan is purely discretionary. Both pay plans provided that Byrider had the right to alter, adjust, or terminate the plan at any time, without notice. The discretionary nature of the plan also leads us to conclude

that the bonus payments are not wages for purposes of the Wage Payment Statute. *See Pyle*, 637 N.E.2d at 1301 [ ] (concluding that bonus system was discretionary and therefore bonuses were not wages); [*Wank v. Saint Francis College*, 740 N.E.2d 908, 913 (Ind. Ct. App. 2000)] (concluding that severance pay was not wage because it was a "discretionary, gratuitous benefit").

*Id*. at 514-15 (footnote omitted, brackets added).

## 2. Commissions Earned by Bragg

[45] In determining whether the commissions at issue qualified as wages under the Wage Payment Statute, we will examine said commissions under the factors set forth by the Seventh Circuit in *Thomas*.

### i. Whether Commission Linked to Contingency

[46] Initially, we note that Bragg claims that the contingency factor is "meaningless" to our analysis of whether the commissions at issue qualify as wages under the Wage Payment Statute. Appellant's Br. p. 12. In making this claim, Bragg asserts that there is nothing "bonus-like" about the commissions at issue and that "[t]o date, the 'other factors' analysis has only been applied to commissions that are bonus-like." Appellant's Br. pp. 12, 13. We disagree and note that nothing in any of the relevant authority supports Bragg's assertion that the contingencies factor should only be considered in the context of bonuses.[6] Furthermore, we find nothing in the designated evidence that would seem to

---

[6] We also note that, generally speaking, all commissions are bonus-like in nature, and that Bragg points to no relevant authority or designated evidence which would suggest otherwise.

differentiate the commissions involved in the instant matter from the previously-considered types of commissions.

[47]     Bragg also asserts that applying the contingencies factor to the consideration of whether the commissions at issue constitute wages under the Wage Payment Statute "would ignore the definition of 'wages' as articulated by the General Assembly." Appellant's Br. p. 13. However, it is of note that in *Thomas*, the Seventh Circuit rejected this very assertion, citing to Indiana case law which has expressly provided that because it is the substance of the compensation that guides our analysis, and not its label, commissions do not always constitute wages. 630 F.3d at 666 (citing *McCausland*, 918 N.E.2d at 424-26; *Gress*, 826 N.E.2 at 4). It is also of note that in making this assertion, Bragg fails to acknowledge *Thomas* and the Indiana cases on which *Thomas* relies.

[48]     Bragg further asserts that because the courts have only considered the profitability of the employer's company to be a relevant contingency, any other contingencies are irrelevant to the question of whether the commissions at issue constitute wages under the Wage Payment Statute. The Seventh Circuit expressly rejected a similar assertion in *Thomas*, noting that relevant Indiana authority indicates that a company's performance "is merely one example of a contingency." 630 F.3d at 667. In rejecting this assertion, the Seventh Circuit stated that "[t]he Indiana Supreme Court has not limited the relevant contingencies to business performance, and imposing such a limit would be contrary to Indiana case law." *Id*.

[49] In the instant matter, the designated evidence contained numerous types of contingencies that affected whether Bragg earned commissions. Commissions were not earned by sales alone, but rather by "delivered sales." Appellee's App. p. 43. As such, commissions were dependent upon the payment for and acceptance of delivery of the item by the customer. In addition, if employees worked together on a sale, any commissions earned as a result of said sale could be divided among the employees.

[50] Further, because commissions were dependent upon delivery, numerous factors which might take place after the initial sale, all of which were outside of Bragg's control, could potentially affect whether Bragg earned commissions. For example, Bragg would not be entitled to commissions if, after the initial sale, the customer decided to return the item or cancel the order. The amount of commission earned would be also affected if there was a subsequent price adjustment to the item, which would negatively impact the amount of profit earned by Kittle's on the sale. Therefore, even if a commission was ultimately earned, because said commission was dependent on delivery, numerous factors, again all of which were outside of Bragg's control, could impact when said commission was actually earned. For instance, factors such as product availability, weather conditions, a customer's location, and a customer's availability could impact when delivery was made. The type of order could also impact delivery as some custom orders could take as many as sixteen weeks for delivery.

[51] The designated evidence also outlines the process by which Kittle's calculated commissions earned by its employees. In order to track monthly deliveries for commission purposes, Kittle's maintained a "commission edit list." Appellee's App. p. 37. This list would be made available for employees to review on the fourth day of each month. Employees would then review the list and work with store management to resolve any potential discrepancies. Once finalized, the information would be manually imput and commissions calculated. The commissions earned were then sent to an outside payroll service for processing. The entire process took multiple days to complete.

[52] In light of the numerous factors involved in determining whether and when a commission was earned by an employee, we conclude that the designated evidence demonstrates that the commission could not always be quickly and accurately calculated within the ten-day time constraint set forth in the Wage Payment Statute. This factor supports the determination that, as a matter of law, the commissions at issue did not constitute wages under the Wage Payment Statute. *See generally, McCausland*, 918 N.E.2d at 424 (citing *Highhouse*, 807 N.E.2d at 740 (noting that because the Wage Payment Statute imposes a penalty when wages are not paid within ten days of the date they are earned, it is not practical to apply the statute to payments that cannot be calculated within ten days after being earned)).

### ii. Relation to Time Worked

[53] We have previously concluded that if compensation is not linked to the amount of work done by an employee, it is not a wage. *Hansen*, 874 N.E.2d at 1072. In

*Gress*, we noted that "[t]o be sure, a salesperson could work for an entire year without earning any commissions if none of [their] projects were profitable." 826 N.E.2d at 4. The same can be said here.

[54] The designated evidence here demonstrates that the payment of commission was not directly linked to the amount of work performed by Bragg. Commissions were not earned merely by working for a week. Rather, they were awarded only if the salesperson completed delivered sales. Thus, while potentially unlikely, it is at least possible that Bragg could have worked for an entire month without completing any "delivered sales." If that were the case, Bragg would not earn any commission for that month. Thus, we conclude that this factor supports also the determination that, as a matter of law, the commissions at issue did not constitute wages under the Wage Payment Statute. *See generally, Hansen*, 874 N.E.2d at 1072 (providing that if compensation is not linked to the amount of work done by an employee, it is not a wage).

### iii. Payment on Regular Basis

[55] Bragg seems to acknowledge that the amount of any commission earned could vary greatly from month to month. She asserts, however, that we should find the fact that Kittle's had a regular monthly payment schedule in place for the payment of any commissions earned by their employees to be evidence demonstrating that the commission payments paid by Kittle's were made on a regular basis.

In *Quezare*, we considered whether certain bonus payments were paid on a regular basis. 941 N.E.2d at 514. We concluded that although the bonuses were calculated on a weekly basis, they were paid only if certain goals were met. *Id*. Thus, the payments were not necessarily paid on a regular basis. *Id*. Similarly, here, although commissions were calculated and paid on a monthly basis, any commissions paid were dependent upon "delivered sales" being completed by Bragg. Further, although Kittle's followed a specific schedule for determining if any commissions had been earned, commission payments were not paid on any pre-scheduled date, but rather varied from month to month. Because the amount of any monthly commission payment could vary greatly, and could even include months where no commission payment was earned by Bragg, we conclude that like in *Quezare*, the commissions at issue here were not made on a regular basis. We therefore conclude that this factor supports also the determination that, as a matter of law, the commissions at issue did not constitute wages under the Wage Payment Statute.

### iv. Other Wages

Bragg acknowledges that the commission payment was paid by Kittle's in addition to her salary. She asserts, however, that this fact is "meaningless" because there is no statutory authority limiting an employee to only one type of wage. Appellant's Br. p. 11. We agree that Bragg was not limited to earning only one type of compensation. However, we believe that the fact that Bragg could potentially earn different types of compensation—one being her salary which undoubtedly qualifies as a wage under the Wage Payment Statute—does

not mean that each of the different types of compensation which she could potentially earn would automatically qualify as wages under the Wage Payment Statute. Rather, we conclude that the best practice is to examine each type of compensation independent of any other type to determine whether it constitutes a wage under the Wage Payment Statute.

### v. Conclusion

[58] In the instant matter, it is undisputed that Bragg earned commissions in addition to a regular salary and that Kittle's has paid Bragg all earned commissions. As is discussed above, the designated evidence demonstrates that these commissions were not directly linked to the amount of work performed by Bragg, but rather were contingent upon numerous factors, over most of which Bragg had no control. These commissions were paid only when earned, and not on a regular basis. As such, we determine that, as a matter of law, the commissions did not qualify as wages under the Wage Payment Statute. We therefore conclude that the trial court did not err in awarding summary judgment in favor of Kittle's on this ground.[7]

---

[7] To the extent that Bragg relies on our opinion in *J Squared, Inc. v. Herndon*, 822 N.E.2d 633 (Ind. Ct. App. 2005), we find *Herndon* to be distinguishable from the instant matter as our decision in *Herndon* did not turn on whether the commission at issue constituted a wage under the Wage Payment Statute. In *Herndon*, we considered whether the trial court erred in awarding damages to Herndon under the Indiana Wage Claims Statute. 822 N.E.2d at 639-641. The Wage Claim Statute provides that an employer is responsible for paying employees for wages and compensation due at the time of separation of the employee's employment. *Id.* at 640 (citing Ind. Code § 22-2-9-2). Concluding that Herndon had earned commission by

# Conclusion

[59] In sum, we conclude that the trial court did not err in in dismissing the claims raised on behalf of the unknown purported class members whose employment was involuntarily terminated by Kittle's or in awarding summary judgment in favor of Kittle's. As such, we affirm the judgment of the trial court.

[60] The judgment of the trial court is affirmed.

Baker, J., and Pyle, J., concur.

---

securing sales on order prior to the termination of his employment and that J Squared had failed to pay Herndon the earned commission, we affirmed the trial court. *Id.* at 641.